**No. 20-16068**
**(Consolidated with Nos. 20-16070, 20-16773, and 20-16820)**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

PLANNED PARENTHOOD FEDERATION OF AMERICA, *et al.*,
*Plaintiffs-Appellees*,
v.
TROY NEWMAN, *et al.*,
*Defendants-Appellants*.

_____

On Appeal from the U.S. District Court for the Northern District of California,
No. 3:16-cv-00236-WHO, Hon. William H. Orrick

_____

**DEFENDANT-APPELLANT TROY NEWMAN'S OPENING BRIEF**

_____

Edward L. White III
Erik M. Zimmerman
John A. Monaghan*
Christina A. Stierhoff
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105
Tel: (734) 680-8007

Vladimir F. Kozina
MAYALL HURLEY, P.C.
2453 Grand Canal Blvd.
Stockton, CA 95207
Tel: (209) 477-3833

* Not admitted to 9th Circuit bar

*Attorneys for Defendant Troy Newman*

# Table of Contents

Jurisdictional Statement ...........................................................................1

Issues Presented .......................................................................................1

Statement of the Case...............................................................................2

Summary of the Argument........................................................................7

Argument...................................................................................................9

I.      Plaintiffs failed to prove the elements of their RICO claim............9

        A.      Plaintiffs failed to prove the commission of any RICO predicate
                acts, as the production and transfer of the identifications at issue
                was not in, and did not affect, interstate commerce.............................9

        B.      Plaintiffs failed to prove the requisite "pattern" of "continuous"
                RICO predicate acts..............................................................13

II.     The judgment should be vacated because the district court's decision to
        allow the jury to draw twenty adverse inferences from valid invocations
        of Fifth Amendment privilege by Newman and two non-parties was
        unconstitutional.................................................................................18

        A.      Introduction .........................................................................18

        B.      Plaintiffs had many ways to obtain information about the topics at
                issue that were less burdensome than a long list of adverse
                inferences............................................................................21

        C.      There was no "substantial need" for any of the inferences.................26

        D.      Some of the inferences are not supported by any evidence
                presented to the jury. ..........................................................29

        E.      The district court erred by permitting inferences upon inferences
                that were not directly tied to questions for which a witness
                invoked the privilege. ..........................................................32

i

F.    Several of the inferences were barred by California Evidence Code § 913, FRE 501, and/or FRE 403. .............................................34

G.    The district court erred by permitting adverse inferences based upon two non-parties' invocation of privilege. ...................................38

H.    Newman, and all other Defendants, were unfairly prejudiced by the district court's decision to permit numerous unconstitutional adverse inferences. ...............................................................................40

III.    The jury verdict and judgment against Newman was not supported by substantial evidence, and should be reversed. .................................43

A.    Elements of conspiracy ......................................................................45

B.    Summary of Newman's minimal knowledge and involvement..........46

C.    RICO conspiracy ................................................................................52

D.    Conspiracy to commit fraudulent misrepresentation and false promise fraud......................................................................................54

E.    Conspiracy to commit trespass and violate recording statutes. ..........55

F.    Punitive damages and injunctive relief ...............................................57

Conclusion ...........................................................................................................58

Statement of Related Cases...................................................................................60

Certificate of Compliance .....................................................................................61

## Table of Authorities

**Cases**

*Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995) ................................................ 17

*Atencio v. Arpaio*, No. CIV. 12-2376-PHX-PGR, 2013 U.S. Dist. LEXIS 148918 (D. Ariz. Oct. 15, 2013) .............................................................. 26

*Ayers v. Lee*, Case No. 14-cv-00542-BGS-NLS, 2020 U.S. Dist. LEXIS 218003 (S.D. Cal. Nov. 20, 2020) .............................................................. 38

*Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) ............................................................. 52

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) ............................................................. 30

*Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) ........................................ 19

*Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751 (9th Cir. 2017) ............. 9

*Doe v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000) .................................................. *passim*

*Dowd v. Calabrese*, 589 F. Supp. 1206 (D.D.C. 1984) ......................................... 57

*Downey v. Coalition Against Rape & Abuse, Inc.*, Civ. No. 99-3370 (JBS), 2005 U.S. Dist. LEXIS 7340 (D.N.J. 2005), *aff'd by* 2005 U.S. App. LEXIS 18866 (3d Cir. 2005) ................................................................. 57

*Durning v. Citibank, Int'l*, 990 F.2d 1133 (9th Cir. 1993) ................................... 16

*Farrah v. Chacon*, No. 18-cv-00895-NRN, 2018 U.S. Dist. LEXIS 223400 (D. Colo. Dec. 6, 2018) ............................................................................ 30

*Food Lion v. Capital Cities/ABC*, 887 F. Supp. 811 (M.D.N.C. 1995) ............ 15-16

*Frances T. v. Village Green Owners Ass'n*, 42 Cal. 3d 490 (1986) ...................... 46

*Globe Int'l, Inc. v. Superior Ct.*, 9 Cal. App. 4th 393 (1992) ................................ 16

*Gonzales v. City of San Jose*, No. 13-cv-00695-BLF, 2015 U.S. Dist. LEXIS 163955 (N.D. Cal. Dec. 4, 2015) ........................................................ 30

*Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566 (1973) ................................................ 55

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ..........................................13, 14

*Hagen v. City of Eugene*, 736 F.3d 1251 (9th Cir. 2013) .......................................43

*Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000)............................16

*Jarvis v. Regan*, 833 F.2d 149 (9th Cir. 1987)..................................................16, 17

*Kan-Di-Ki, LLC v. Sorenson*, 723 Fed. Appx. 432 (9th Cir. 2018) (unpub.)..........16

*Kisser v. Coalition for Religious Freedom*, No. 92 C 4508, 1997 U.S. Dist. LEXIS 1744 (N.D. Ill. Feb. 18, 1997) ......................................................................57

*LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995) ........................30

*Lawrence v. Madison Cnty.*, 176 F. Supp. 3d 650 (E.D. Ky. 2016)......................30

*LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997) .............................................38

*Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360 (9th Cir. 1988) ...............................................................................................................14, 16

*Miranda v. Arizona*, 384 U.S. 436 (1966) ..............................................................18

*Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903 (9th Cir. 2008)......18-19, 26-32

*Navarrete v. Meyer*, 237 Cal. App. 4th 1276 (2015)...............................................57

*Prime Media Grp., LLC v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 U.S. Dist. LEXIS 15492 (N.D. Cal. Feb. 6, 2015) ..........................................................25

*Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364 (9th Cir. 1992).......................16

*Retz v. Samson*, 606 F.3d 1189 (9th Cir. 2010) ......................................................29

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986) ........................................................................................................................16

*SEC v. Fujinaga*, 696 Fed. Appx. 203 (9th Cir. 2017) (unpub.) ............................22

*SEC v. Fujinaga*, 698 Fed. Appx. 865 (9th Cir. 2017) (unpub.) ............................22

*SEC v. Graystone Nash, Inc.*, 25 F.3d 187 (3d Cir. 1994) ......................................30

*Sedima v. Imrex Co.*, 473 U.S. 479 (1985) .............................................................14

iv

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992) .....................................16

*Singh v. U.S. Bank*, 457 B.R. 790 (E.D. Cal. 2011) ................................................54

*Strong v. Wisconsin*, 544 F. Supp. 2d 748 (W.D. Wis. 2008) ................................55

*Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004) .................................................. 14-16

*Ullmann v. United States*, 350 U.S. 422 (1956) ...................................................36

*Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980 (9th Cir. 2017) ................43

*United States v. Agarwal*, 314 Fed. App'x 473 (3d Cir. 2008) (unpub.)................11

*United States v. Custer Battles, LLC*, 415 F. Supp. 2d 628 (E.D. Va. 2006)....21, 41

*United States v. Della Rose*, 278 F. Supp. 2d 928 (N.D. Ill. 2003) ........................12

*United States v. Edlefsen*, No. 2:13-CV-00685-SU, 2014 U.S. Dist. LEXIS 133699 (D. Ore. July 23, 2014) ................................................................................26

*United States v. Jackson*, 155 F.3d 942 (8th Cir. 1998) ........................................11

*United States v. Klopf*, 423 F.3d 1228 (11th Cir. 2005) ........................................11

*United States v. Spears*, 697 F.3d 592 (7th Cir. 2012), *reh'g en banc granted, opinion vacated*, No. 11-1683, 2013 U.S. App. LEXIS 3165 (7th Cir. Jan. 14, 2013), *opinion reinstated in part on reh'g*, 729 F.3d 753 (7th Cir. 2013) .............10

*Venegas v. Wagner*, 831 F.2d 1514 (9th Cir. 1987) ...............................................43

*Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 U.S. Dist. LEXIS 73843 (N.D. Cal. May 15, 2017).....................................................................26

*Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158 (2d Cir. 2017) ........................................................................................................................40

## Constitutions, Statutes, and Rules

18 U.S.C. §§ 1028(a)(1), (2) .............................................................................. 9-13

18 U.S.C. § 1028(a)(3)...........................................................................................11

18 U.S.C. § 1028(c)(3)(A) ................................................................. 9-13

18 U.S.C. § 1961 *et seq.* (RICO) ....................................................*passim*

18 U.S.C. § 1962(c) .............................................................................13

18 U.S.C. § 1962(d) .............................................................................52

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1367 ...................................................................................1

Cal. Bus. & Prof. Code § 17200 ........................................................6, 35

Cal. Evid. Code § 913 ................................................................ 19, 34-35

Cal. Penal Code § 633.5 .....................................................................35

FRAP 4(a)(1), (4) .................................................................................1

FRAP 28(i) ...........................................................................................2

FRCP 8(a) & (b)(1) .............................................................................55

FRCP 30(b)(6) ..........................................................................22, 24, 26

FRE 403 ......................................................... 19, 28, 34-37, 42

FRE 501 ................................................................ 19, 34-35

FRE 610 .............................................................................................37

Kan. Stat. § 21-6101 ...........................................................................58

U.S. Const. amend. I ........................................................................4, 58

U.S. Const. amend. V..................................................................*passim*

## Jurisdictional Statement

The district court had federal question and supplemental jurisdiction under 28 U.S.C. §§ 1331, 1367. The court entered a final judgment in favor of Plaintiffs-Appellees on April 29, 2020. Defendants-Appellants filed post-judgment motions on May 26, 2020, which were denied on August 19, 2020.

Defendant-Appellant Troy Newman timely filed both a notice of appeal on May 28, 2020, and an amended notice on September 16, 2020, concerning the April 29 order and judgment, the August 19 order, the jury verdict, and all preceding district court orders and rulings. 26-ER-6928; FRAP 4(a)(1), (4). This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

I.     Are Defendants-Appellants entitled to judgment on Plaintiffs' RICO claim because Plaintiffs failed to prove the existence of a continuous pattern of RICO predicate acts since the few relevant events were not predicate offenses, occurred over a short period of time, and concluded before this lawsuit was filed?

II.    Should the judgment be vacated because the district court's decision to allow the jury to draw twenty adverse inferences from invocations of Fifth Amendment

1

privilege by Newman and two non-parties was unconstitutional, contrary to the Federal Rules of Evidence and California law, and unfairly prejudicial?

III.    Is Newman entitled to judgment as a matter of law on the claims for which he was found liable—and entitled to have the punitive damages award against him vacated—because the jury verdict and judgment were not supported by substantial evidence that Newman knew that another Defendant planned to commit tortious or illegal acts, and agreed and intended that those acts be committed?

## Statement of the Case

To avoid repetition with the other Defendants-Appellants' briefs,[1] the facts discussed herein focus on the lack of any basis for (1) Plaintiffs' RICO claim, (2) the district court's decision to allow the jury to draw twenty adverse inferences from valid invocations of Fifth Amendment privilege, and (3) holding Newman liable on any claim.

Defendant David Daleiden led an undercover investigation into the illegal procurement and sale of human fetal tissue and organs after extensive research into the subject. 25-ER-6804-18, 10-ER-2722, 11-ER-2785-86. Before going

---

[1] Newman adopts these briefs by reference. FRAP 28(i).

undercover, Daleiden learned, for instance, that researchers had obtained fetal hearts from StemExpress ("a commercial vendor of fetal tissue") and attempted to keep those hearts beating after they were removed. 25-ER-6809, 11-ER-2812-14. Additionally, Daleiden took a screenshot of

> a drop-down menu order form for fetal organs and tissues [on StemExpress's website]. . . . They had about 50 to a hundred different body parts listed. . . . [Y]ou could get a heart with veins and arteries still attached . . . a brain . . . kidneys. . . . genitals.

11-ER-2808-09, 25-ER-6808.

For a few years, Daleiden led an undercover investigation of illegal activities. 10-ER-2495. After Daleiden began to publish the investigation's findings in July 2015, which exposed criminal and unethical activities within the fetal tissue procurement and abortion industries, both houses of Congress conducted their own investigations. Congress referred some organizations to law enforcement agencies, and issued reports that contain extensive evidence of profiting from the sale of fetal organs and tissue, altering abortion procedures for financial gain, and numerous other criminal and unethical acts; other government agencies reached similar conclusions.[2]

---

[2] Daleiden's brief discusses the evidence of crime, and the government investigations, in more detail.

3

Plaintiffs, which include entities that Congress determined had committed wrongful acts, brought this lawsuit "to recover damages for the ongoing harm to Planned Parenthood emanating from the video smear campaign." 24-ER-6629.[3] By the time this lawsuit was filed in January 2016, Newman was no longer a board member of the Center for Medical Progress ("CMP"). Dkt. #609-1, ¶ 125. Plaintiffs are Planned Parenthood Federation of America and many of its affiliates. They assert claims related to the investigation and publication of the videos, such as a RICO violation stemming from the production or transfer of identification documents in or affecting interstate commerce,[4] breach of contract, fraud, trespass, and unfair competition. Defendants are CMP, BioMax Procurement Services, Daleiden, Newman, Albin Rhomberg, Sandra Susan Merritt, and Gerardo Adrian Lopez.

The district court denied Defendants' motions to dismiss except for dismissing wire and mail fraud as predicates for the RICO claim. 2-ER-355-58. Although the court denied the parties' motions for summary judgment with respect to most issues and claims, the court granted partial summary judgment to Plaintiffs

---

[3] Other Defendants-Appellants' briefs address the fact that Plaintiffs' lawsuit and claimed damages are premised, in large part, upon *the content and communicative impact of Defendants' publications*, but Plaintiffs were not required to meet First Amendment standards for publication-based claims and damages, and Defendants were barred from obtaining discovery to show their publications were true.

[4] The events concerning these IDs will be discussed in more detail in § I.

on, *inter alia*, the interstate commerce element of the alleged RICO predicate offenses. 2-ER-161-65.

Additionally, the court denied, in large part, Newman's motions *in limine* (Dkt. #754), including with respect to (1) Newman's assertion of the Fifth Amendment in his deposition, and (2) various anti-abortion statements made, and actions taken, over the past few decades by Newman and/or a non-party entity that he leads (Operation Rescue). 1-ER-132-33.

Near the conclusion of the jury trial, the district court granted (in large part) Plaintiffs' request for the court to instruct the jury that they may draw numerous adverse inferences from the fact that Newman, and two non-party witnesses, invoked their Fifth Amendment privilege at their depositions. 1-ER-112. The court instructed the jury that they could draw adverse inferences from the invocation of Fifth Amendment privilege by Newman and the two-non parties, and read the jury a list of fourteen specific inferences with respect to Newman and six specific inferences with respect to the non-parties. 14-ER-3889-96.[5]

The following week, the jury was again instructed that they could draw many adverse inferences from the invocation of Fifth Amendment privilege by Newman and the non-parties. 16-ER-4274-76. On the same day, Plaintiffs repeatedly relied

---

[5] The details of these adverse inferences are discussed in § II.

upon the court's adverse inference ruling and instructions during their closing argument to argue that Newman should be held liable. 16-ER-4363-69, 16-ER-4426-27. Plaintiffs even went so far as to falsely claim—based solely upon the first adverse inference—that Newman advocated for vigilante acts of violence against abortion providers in a decades-old inadmissible religious text *that the court had properly excluded from evidence*. 16-ER-4426-27, 1-ER-113.

The jury ruled in Plaintiffs' favor on all counts, awarded over $2 million in damages, found Newman liable via conspiracy on several counts, and awarded punitive damages against all Defendants. 18-ER-4925-68. The district court denied Newman's pre-verdict (Dkts. #996, 999) and post-verdict (Dkt. #1080) motions requesting judgment as a matter of law. 1-ER-2. The court entered judgment in Plaintiffs' favor on all claims, and issued an injunction under the California unfair competition law ("UCL") claim. 1-ER-38, 1-ER-48.

The facts relating to the IDs and the adverse inferences are discussed in more detail in Sections I and II, respectively. Further, as discussed in detail in Section III (and in Daleiden's brief), the undercover investigation was, from start to finish, the work of Daleiden. Daleiden conceived the project, managed it, directed other players, and produced the project's findings. While Newman was aware of the project's overall goal of exposing illegal activities, *see* 25-ER-6804-18, there is *no evidence* that Newman was ever informed that other Defendants would be doing

6

anything illegal or tortious, *nor is there any evidence* that Newman agreed and intended that such wrongful activities should take place. As demonstrated in Section III, Plaintiffs' efforts to show the contrary are unavailing.

### Summary of the Argument

I.      All Defendants are entitled to judgment on the RICO claim. Plaintiffs failed to prove that any RICO predicate acts were committed. There was no evidence that the production or transfer of the few identification documents was in, or affected, interstate commerce; the relevant events all occurred in California. Additionally, Plaintiffs failed to prove a pattern of continuous racketeering activity. The alleged predicate acts occurred over several months, had a definite endpoint, and were tied to a specific investigation that concluded before this lawsuit was filed. Furthermore, the alleged predicate acts were not the type of activity that, by its nature, projects into the future with a threat of repetition.

II.     All Defendants, and especially Newman, were unfairly prejudiced by the district court's erroneous decision to allow the jury to draw twenty adverse inferences from invocations of Fifth Amendment privilege by Newman and two non-parties. The court's decision was contrary to *Doe v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000), including this Court's holding that "no negative inference can be drawn . . .

7

unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information." *Id.* at 1264-65.

All twenty inferences were improper for one or more reasons, such as the fact that there were other ways to inform the jury about the topics at issue, the subject matter of the inferences was not central to the case and/or was unfairly prejudicial (such as quoting a decades-old theological text that the court held was inadmissible), or the inference was barred by the evidence rules or state law. The high number of inferences, their irrelevant and unfairly prejudicial content, and the fact that Plaintiffs repeatedly relied upon them during their closing argument all illustrate that the violation of Newman's constitutional rights was not harmless, and warrants reversal.

III.    Newman did not personally take part in the relevant events giving rise to this lawsuit (*e.g.*, attending conferences, transferring IDs). Rather, the judgment against Newman rests solely on the claim that he conspired with other Defendants to commit tortious or unlawful acts. Plaintiffs were required to prove, concerning each claim, that Newman "was aware that another Defendant or person planned to commit a wrongful act," "agreed with the other Defendant or person, and intended that the wrongful act be committed." 16-ER-4319.

There was not substantial evidence that Newman knew about, and agreed to be a part of, any wrongful conduct. To the contrary, the evidence established that Newman did not know about, authorize, direct, or encourage any wrongful actions of anyone else. The judgment should be reversed with respect to Newman.

## Argument

### I.     Plaintiffs failed to prove the elements of their RICO claim.

The decision to grant Plaintiffs summary judgment on the interstate commerce element of their RICO claim, and the denial of Defendants' motions for judgment as a matter of law, are reviewed *de novo*. *Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 759 (9th Cir. 2017).[6]

#### A.     Plaintiffs failed to prove the commission of any RICO predicate acts, as the production and transfer of the identifications at issue was not in, and did not affect, interstate commerce.

The only purported RICO predicate acts at issue were unlawful *production* and *transfer* of false identifications in or affecting interstate commerce:

(a) Whoever, in a circumstance described in subsection (c) of this section—
(1) knowingly and without lawful authority *produces* an identification document, authentication feature, or a false identification document; [or]

---

[6] The issues addressed in this Section were raised at Dkt. #605 at 11-17, #652 at 32-33, #998 at 1-2, #1080 at 16-20, and Dkt. #1103 at 9-10, and were ruled on at 2-ER-160-65 & 1-ER-17-18.

(2) knowingly *transfers* an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority;
 . . .
shall be punished. . . .

(c) The circumstance referred to in subsection (a) of this section is that—
 . . . (3) . . . (A) *the production, transfer*, possession, or use *prohibited by this section is in or affects* interstate or foreign commerce. . . .

18 U.S.C. §§ 1028(a)(1), (a)(2), and (c)(3)(A) (emphasis added).

The district court adopted an unprecedented and extremely broad interpretation of "in or affects," and committed reversible error by holding that Daleiden's production or transfer of a few ID's was "in or affect[ed]" interstate commerce. 2-ER-164.[7] The handful of events that are related to the alleged RICO predicate acts consisted of purely *intrastate* activity in California: 1) Daleiden produced one identification at his home in California; 2) Daleiden used a website one time to find someone to produce the "Tennenbaum" and "Allen" documents in California; 3) those documents were hand-delivered to Daleiden in California; 4) Daleiden hand-delivered them to Defendant Merritt and Brianna Baxter in

---

[7] Plaintiffs also did not establish as a matter of law that the IDs all fall within the purview of § 1028. *See United States v. Spears*, 697 F.3d 592, 600 (7th Cir. 2012) ("false identification" under § 1028 requires that a document "at least appear to be government-issued and of a type commonly accepted for identification"), *reh'g en banc granted, opinion vacated*, No. 11-1683, 2013 U.S. App. LEXIS 3165 (7th Cir. Jan. 14, 2013), *opinion reinstated in part on reh'g*, 729 F.3d 753 (7th Cir. 2013).

California; and 5) Daleiden paid for these documents in cash in California. *Id.* at 24; 10-ER-2542-43, 10-ER-2575-76, 11-ER-3069-71, 12-ER-3077-80, 20-ER-5315.

Nevertheless, even while "[r]ecognizing the absence of Ninth Circuit authority" on the issue, 2-ER-164, the court erroneously granted summary judgment to Plaintiffs on the interstate commerce requirement for three reasons. First, the court relied on an unpublished, non-binding decision, *United States v. Agarwal*, 314 Fed. App'x 473 (3d Cir. 2008), in holding that Daleiden's use of the Internet to locate a person in his state to produce the IDs made the production "in or affect[ing]" interstate commerce. 2-ER-163-64. *Agarwal* listed use of the Internet as one of several factors, including the fact that the component parts of the ID traveled through interstate commerce. 314 Fed. App'x at 475. This Court need not decide whether *Agarwal*'s analysis is correct, however, because Plaintiffs presented no evidence that any component parts of the IDs here traveled through interstate commerce.[8]

Second, the court held that Defendants' *use* of the ID's in different states was sufficient to meet the interstate commerce requirement, and erroneously relied on two cases that involved violation of § 1028**(a)(3)**,[9] a subsection *that is not at issue in this case*, which prohibits possession "with intent *to use unlawfully*." Here, under

---

[8] Additionally, Daleiden's one-time use of the Internet would be insufficient to establish a requisite pattern of RICO predicate acts. *See* § I.B.

[9] 2-ER-162-64 (citing *United States v. Klopf*, 423 F.3d 1228 (11th Cir. 2005); *United States v. Jackson*, 155 F.3d 942 (8th Cir. 1998)).

§§ 1028**(a)(1) & (2)**, Plaintiffs had to prove that it was specifically the "*production* [*or*] *transfer . . . prohibited by this section*" that was "in or affects interstate commerce." § 1028(c)(3)(A) (emphasis added). As one court stated in an analogous situation, "under the plain language of the statute, it is the production that must be in or affect interstate commerce." *United States v. Della Rose*, 278 F. Supp. 2d 928, 933 n.2 (N.D. Ill. 2003). Here, the eventual use of the IDs is not relevant to whether the acts of *producing and transferring* them were in or affecting interstate commerce. The district court's improper reliance upon *uses* of IDs in a *production/transfer* case (2-ER-167, 2-ER-360, 2-ER-364) is clearly contrary to the statute, and thereby improperly brought non-predicate acts within RICO's draconian scope.

Third, the court concluded that Defendants "intended to affect interstate commerce in creating the false IDs." 2-ER-164. Under the statute's plain language, however, what matters is whether "the production [or] transfer . . . is in or affects" interstate commerce, § 1028(c)(3)(A), not whether someone hoped it would. The lack of any evidence that the production or transfer of the IDs was *actually* in, or *actually* affected, interstate commerce means that there were no predicate acts, which is fatal to the RICO claim.

Further, *there is no evidence* that Daleiden actually intended that the handful of relevant acts would be in, or affect, interstate commerce. In this regard, the court

again erred by relying on various actions—*e.g.*, attending conferences and meetings—*that are wholly irrelevant* to § 1028(c)(3)(A). 2-ER-163-64 ("PPFA and entities across states lines were not only targeted, but successfully infiltrated"). Additionally, that Plaintiffs made voluntary expenditures that may have affected interstate commerce after Daleiden began publishing his findings (and after government bodies began to investigate Plaintiffs and their business partners) is irrelevant to the question of whether *the production and transfer of IDs, without more*, was in or affected interstate commerce for the purposes of the fraud statute.

In sum, Plaintiffs presented *no evidence* that Daleiden's modification of his own ID, or acquisition of a couple other IDs, was in, or affected, interstate commerce. Consequently, Plaintiffs failed to prove any violations of § 1028(a)(1)-(2), and Defendants are entitled to judgment as a matter of law on the RICO claim.

**B.     Plaintiffs failed to prove the requisite "pattern" of "continuous" RICO predicate acts.**

RICO does not apply to every situation in which two or more predicate offenses are committed. Rather, Plaintiffs were required to prove that Defendants engaged in a "*pattern* of racketeering activity," 18 U.S.C. § 1962(c) (emphasis added), which consists of the commission of RICO predicate acts that are "'related' and 'continuous.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Here, the few acts that are alleged to be RICO predicate acts occurred over the course of no more than six months, at the outset of one finite project with a limited timeframe,

and concluded long before this lawsuit was filed. 2-ER-162, 20-ER-5315. Plaintiffs' RICO claim fails because—contrary to the requirements of established case law—the alleged predicate acts did not occur over a substantial period of time, and did not threaten to continue into the future. *See H.J. Inc.*, 492 U.S. at 239.

The Supreme Court has explained that, although a "pattern of racketeering activity . . . requires *at least* two acts of racketeering activity," "two isolated acts of racketeering activity *do not* constitute a pattern" since "[t]he target of [RICO] is . . . *not sporadic* activity." *Sedima v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985) (citations omitted) (emphasis added). Plaintiffs were required to demonstrate "a threat of continued *racketeering* activity," *i.e.*, that "*the racketeering predicates* . . . amount to or pose a threat of continued criminal activity," such as when predicate acts are "a regular way of conducting [a] defendant's ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 239, 242-43 (emphasis added). As such, "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement," as "Congress was concerned in RICO with long-term criminal conduct." *Id.* at 242.

Likewise, this Court has held that "a RICO plaintiff must charge a form of *predicate* misconduct that '*by its nature projects into the future* with a threat of repetition.'" *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (citations omitted) (emphasis added); *Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833

F.2d 1360, 1363 & n.2, 1365 (9th Cir. 1988). Here, there was no evidence that the purported predicate acts are the type of activity that "by its nature projects into the future with a threat of repetition." *Id.* To the contrary, Daleiden's modification or acquisition of a few IDs was an isolated occurrence—related to *one* undercover investigation—that *had a concrete endpoint* almost two years before this lawsuit was filed. More generally, Daleiden intended to investigate and expose Plaintiffs' illegal activities, 25-ER-6804-18, and *in Plaintiffs' own words*, Daleiden's plan "came to fruition" when CMP began to release "Human Capital Project" videos in July 2015. 24-ER-6660.

An analogous case illustrates that Plaintiffs' RICO claim is without merit. In *Food Lion v. Capital Cities/ABC*, 887 F. Supp. 811 (M.D.N.C. 1995), the court dismissed RICO claims that stemmed from an undercover investigation of the plaintiff's practices because the alleged predicate acts did not constitute a "pattern" under RICO. *Id.* at 820. The alleged mail and wire fraud, which involved misrepresentations to the plaintiff "to gain access to areas not open to the public and to gain information about its operations," occurred over the course of six months. *Id.* at 818. The court held that the predicate acts "were part of a limited purpose, to obtain information from Food Lion to be aired on PTL," and the alleged "scheme to defraud concluded when its purpose, to collect information, was realized." *Id.* at 818,

820. The court also noted that "the pattern requirement is designed to prevent the transformation of an ordinary fraud case into a federal RICO claim." *Id.* at 820.[10]

*Food Lion* is consistent with the many decisions of this Court holding that there is no RICO pattern where, as here, the alleged predicate acts related to one particular event, or a plan with a definite endpoint, such that those acts did not threaten to continue into the future. *See, e.g., Turner*, 362 F.3d at 1229 (the alleged predicate acts were "finite in nature," as part of a "single scheme" with a definite endpoint, and there was no indication that such acts would continue); *Howard v. America Online, Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) (the alleged predicate acts related to one policy change, and did not become "a 'regular way of doing business'"); *Durning v. Citibank, Int'l*, 990 F.2d 1133, 1139 (9th Cir. 1993) (the commission of many related predicate acts in connection with one event did not constitute a RICO pattern).[11] Conversely, cases in which a series of predicate acts

---

[10] Undercover journalistic activities, which provide a public benefit, are not the organized crime RICO was intended to combat. *See Globe Int'l, Inc. v. Superior Ct.*, 9 Cal. App. 4th 393, 400-01 (1992) (noting, regarding a newspaper's publication of covertly taken photographs, that "RICO was intended to combat organized crime, not to provide triple damages to every tort claimant.").

[11] *See also Kan-Di-Ki, LLC v. Sorenson*, 723 Fed. Appx. 432, 434-35 (9th Cir. 2018) (unpub.); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535-36 (9th Cir. 1992); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 365-66 (9th Cir. 1992); *Medallion*, 833 F.2d at 1363-65; *Jarvis v. Regan*, 833 F.2d 149, 153 (9th Cir. 1987); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399 (9th Cir. 1986).

had no defined endpoint, and might have occurred indefinitely, are clearly distinguishable from the present case.[12]

In sum, three instances of modifying or acquiring an ID within the span of several months, for the purpose of facilitating a well-defined project with a clear endpoint, does not constitute a continuous pattern of predicate acts. Additionally, the district court's reliance on various acts (*e.g.*, speech opposing abortion in general, or Plaintiffs in particular) that are indisputably *not* predicate acts in order to find a RICO pattern (1-ER-18) was contrary to the plain language of RICO and this Court's precedent. *Jarvis*, 833 F.2d at 153. The court committed reversible error by failing to enter judgment in Defendants' favor on the RICO claim.[13]

---

[12] *See, e.g., Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529-30 (9th Cir. 1995) (extorting kickbacks had become two defendants' regular way of doing business, and "the predicate acts could have recurred indefinitely" since they were not connected to any particular endpoint). The alleged predicate acts here involved *the production and transfer of IDs, not the undercover investigation itself*; once Daleiden began to publish the videos, the investigation was necessarily revealed, and producing or transferring future IDs would be pointless.

[13] As explained in Rhomberg's brief, the RICO claim also fails due to the lack of any economic injury directly and proximately caused by the alleged predicate acts.

**II.    The judgment should be vacated because the district court's decision to allow the jury to draw twenty adverse inferences from valid invocations of Fifth Amendment privilege by Newman and two non-parties was unconstitutional.**

**A.    Introduction**

The importance of respecting valid invocations of the privilege against self-incrimination cannot be overstated:

> The lofty principles [underlying the privilege] . . . were implanted after great struggle into the Bill of Rights. Those who framed our Constitution and the Bill of Rights were ever aware of subtle encroachments on individual liberty. . . . We cannot depart from this noble heritage.

*Miranda v. Arizona*, 384 U.S. 436, 458-60 (1966) (citations omitted).

These principles apply in civil cases. This Court has repeatedly recognized that "certain sanctions stemming from a party's refusal to answer a question on Fifth Amendment grounds are too costly," and "under certain circumstances, within the civil framework, because of the constitutional nature of the right implicated, an adverse inference from an assertion of one's privilege not to reveal information is too high a price to pay." *Glanzer*, 232 F.3d at 1264-65; *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 912 (9th Cir. 2008). This case presents such a circumstance.

In *Glanzer*, this Court held that the district court properly prevented the jury from drawing adverse inferences from Elroy's exercise of his Fifth Amendment privilege at his deposition. 232 F.3d at 1267. The Court emphasized that

> "[b]ecause the privilege is constitutionally based, *the detriment to the party asserting it should be no more than is necessary* to prevent unfair and

18

> unnecessary prejudice to the other side." . . . In that light, no negative inference can be drawn . . . unless there is a *substantial need* for the information and *there is not another less burdensome way* of obtaining that information.

*Id.* at 1264-65 (citation omitted) (emphasis added); *Nationwide Life*, 541 F.3d at 912.

In sum, drawing an adverse inference from a witness's invocation of the privilege is unconstitutional unless the witness's assertion of privilege "obliterate[s] another party's right to a fair proceeding.'" *Glanzer*, 232 F.3d at 1264 (citation omitted).

Here, Plaintiffs failed to meet the rigorous standards applicable to requests to draw adverse inferences for the following reasons:

- There were multiple less burdensome ways to present evidence about the topics at issue to the jury.

- There was no "substantial need" for any of the inferences.

- Some of the inferences are not supported by corroborating evidence.

- Some were impermissible "inferences upon inferences" that were not directly related to questions for which a witness invoked the privilege.

- Many of the inferences were barred by California Evidence Code § 913, FRE 501, and/or FRE 403.

- No inferences were warranted with respect to non-party invocations of the privilege.

The district court's order permitting adverse inferences, denial of Newman's motion *in limine* concerning references to the Fifth Amendment, and instructions to the jury concerning the adverse inferences are reviewed *de novo. Berger v. City of*

*Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) ("[A] district court's legal determinations, including constitutional rulings," and rulings on "mixed questions of law and fact that implicate constitutional rights," are reviewed *de novo*).[14]

As explained herein, the court clearly erred by allowing the jury to draw fourteen adverse inferences from Newman's invocation of privilege, and six additional adverse inferences from two non-parties' invocation of privilege. 14-ER-3889-96, 1-ER-112. The court's violation of Newman's constitutional rights, and allowance of the non-party inferences, was unfairly prejudicial to all Defendants. It is a commonly-held belief that invoking one's Fifth Amendment privilege is an indication of guilt; for instance, one juror even "indicated that [they] wouldn't be able to be fair to a party who refused to answer a question based on their Fifth Amendment right against self-incrimination." 3-ER-462-63.[15]

---

[14] The Fifth Amendment issues were extensively briefed, discussed, and ruled upon throughout the case. The most pertinent docket entries are as follows:

Orders or Civil Minutes: 1-ER-111-12, 2-ER-171-72, 1-ER-132-33, 1-ER-121, 1-ER-117, and 1-ER-26-27.

Motions or other documents: Dkt. #754 at 11:13-12:13; 18-ER-5024, 18-ER-5034; Dkt. #806, 823, 853, 953, 956, 966 (and exhibits); 14-ER-3827-69, 14-ER-3889-96; Dkt. #1056 at 8-9, 33; 1-ER-61-62, 1-ER-81; Dkt. #1080 at 39-41 & #1103 at 18-21.

[15] *See also* 1-ER-450-51, 1-ER-458, 1-ER-480-81, 1-ER-504-05, 1-ER-547-48 (numerous prospective jurors expressed the view "that if you are taking the Fifth, there must be something you are hiding").

The sheer volume of the inferences, and the fact that many of them addressed irrelevant and/or unfairly prejudicial subjects, created a significant danger that the jury would "become deaf to the substance of the questions asked and unanswered" and, instead, the many individual inferences would "blur into a single inference that the defendants have committed all the acts alleged by the [Plaintiffs]." *See United States v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 634-36 (E.D. Va. 2006). That is especially true in this case because the jury was informed that they could draw inferences, and was read the list of the twenty individual inferences, *as a part of one long (over 1,250 word) instruction by the court* at the start of one of the trial days.[16] This, coupled with the fact that Plaintiffs' closing argument heavily relied upon the inferences, magnified the prejudicial impact and demonstrates that the judgment should be vacated. In the alternative, the judgment should be vacated with respect to Newman in light of the clear and significant violation of his constitutional rights.

**B.      Plaintiffs had many ways to obtain information about the topics at issue that were less burdensome than a long list of adverse inferences.**

As noted previously, "no negative inference can be drawn" when there is "another less burdensome way of obtaining that information." *Glanzer,* 232 F.3d at 1265. For example, the drawing of adverse inferences has been permitted when the

---

[16] The court's adverse inference instructions would take up almost one-tenth of this brief if they were quoted in full.

person invoking the privilege was *in exclusive possession of key information*, and there were no documents, 30(b)(6) witnesses, or other witnesses who could provide information about the subject(s) at issue. *See, e.g., SEC v. Fujinaga*, 698 Fed. Appx. 865, 867 (9th Cir. 2017) (unpub.) (witness "was the only person in possession of the information" and invoking the privilege "depriv[ed] the SEC of its opportunity to obtain evidence on that question"); *SEC v. Fujinaga*, 696 Fed. Appx. 203, 206 (9th Cir. 2017) (unpub.) (witness was the "sole corporate officer and owner, [he] exclusively possessed information that was material to this case, and he refused to testify as to those matters").

The present case clearly does not fit within this category of cases, and the district court's holding that "the inferences cannot be otherwise adequately established through less burdensome means" "[b]ecause of the nature of inferences, generally going to the defendants' intent and knowledge," 1-ER-112, is contrary to both fact and law. Plaintiffs possessed voluminous evidence on the topics at issue, such as thousands of pages of documents, deposition and trial testimony from a variety of witnesses (such as Daleiden and Rhomberg), and numerous stipulations and admissions from Newman himself.

To illustrate, it is undisputed that *Daleiden, not Newman*, was "the ringleader of the defendants." 1-ER-619. Almost all of the inferences relate to documents *authored by Daleiden*, activities *conducted or directed by Daleiden*, the extent to

which *Daleiden* did (or did not) share information with Newman and others, *Daleiden's goals* for the investigation, and/or other topics that *Daleiden testified about in detail*.[17] Daleiden testified *at length* about all aspects of the case and the investigation: 9-ER-2449 through 10-ER-2547, 10-ER-2574-2725, 10-ER-2775 through 11-ER-2841, 11-ER-2846-2966, 11-ER-2986-3052, 11-ER-3063 through 12-ER-3171.

Additionally, Daleiden explained that Newman did not direct, oversee, or control the day-to-day activities of Daleiden or any other individuals involved in the undercover investigation, and many aspects of what Daleiden and/or the investigators were doing *were not* shared with Newman. 9-ER-2474-79, 10-ER-2693-94, 11-ER-2877-79, 12-ER-3073-74. Several inferences are premised upon Newman's receipt of Daleiden's project proposal (25-ER-6804-18, TRX 24), a document that Daleiden discussed at length at trial. 10-ER-2501-03, 10-ER-2719-22, 11-ER-2794-96, 11-ER-2808-14, 11-ER-2824-31, 11-ER-2834-41. Additionally, Daleiden's testimony addressed the truth (or lack thereof) of the assertion in Newman Inference #7 (14-ER-3892) that Newman "had an integral role in CMP and the Human Capital Project . . . including advising David Daleiden,

---

[17] *See, e.g.,* Newman Inferences #3, 5, and #10-15, Baxter Inference #2, and Davin Inferences #2-4 (14-ER-3891-96).

providing consultation services and material support." 9-ER-2474-78, 10-ER-2693-94, 10-ER-2697-99, 12-ER-3073-75.[18]

Moreover, Daleiden's testimony was corroborated by testimony from Rhomberg, who confirmed the very limited nature of the information that he and Newman occasionally received from Daleiden during the course of the investigation. 5-ER-1123-32, 5-ER-1140-42, 5-ER-1241-42, 5-ER-1255. Plaintiffs also received substantive testimony at 30(b)(6) depositions of CMP and BioMax.

Further, Plaintiffs received countless emails and other documents concerning all aspects of the investigation, and many of those documents were admitted at trial. The district court permitted numerous adverse inferences that quote or summarize various statements made by Newman,[19] and many of the documents were displayed to the jury while the court read the list of inferences. 14-ER-3891-94. Where, as here, documents are a "less burdensome way of obtaining [relevant] information," "no negative inference can be drawn against a civil litigant's assertion of his privilege against self-incrimination." *Glanzer*, 232 F.3d at 1265.

---

[18] In other words, Newman was not in exclusive possession of information about the extent to which he was (or was not) "integral" in directing CMP and the undercover investigation, or the extent to which he did (or did not) advise Daleiden and provide material support.

[19] 14-ER-3891-94 (Newman Inferences #1, 2, 6, 7, 9, and 16).

Finally, *at the district court's suggestion*,[20] Newman provided a list of admissions and stipulations about a variety of facts, including that he received or authored various documents relied upon by Plaintiffs. 18-ER-5028-31. By definition, there is no need for an adverse inference to "prove" a stipulated fact. *Prime Media Grp., LLC v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 U.S. Dist. LEXIS 15492, at *9 (N.D. Cal. Feb. 6, 2015) ("As to item 1, the parties have stipulated to that item, thus no adverse inference would be warranted or needed.").

In short, Daleiden's testimony—as the person with firsthand knowledge of all aspects of the investigation—coupled with the other evidence and stipulations discussed previously, were "less burdensome way[s] of obtaining . . . information" about the topics at issue. *Glanzer*, 232 F.3d at 1265. The contention that Newman's invocation of privilege foreclosed Plaintiffs from receiving any information about what Newman did (or did not) know, say, or intend about the investigation is clearly incorrect. The district court expressly acknowledged the potential for Daleiden's testimony (along with stipulations) to eliminate any basis for inferences, stating before the trial: "[Daleiden's] testimony *may obviate the need for some of the inferences*. . . . I will consider the testimony to date and the facts to which Newman

---

[20] 1-ER-121 ("Newman should consider stipulating to uncontested facts regarding his background and role with CMP. Otherwise, the Court will have to consider using additional adverse inferences against him or providing its own instruction. . . .").

would stipulate (Dkt. No. 841) in making a final determination as to which adverse inferences to instruct on." 1-ER-117 (emphasis added); 11-ER-2978-79, 12-ER-3130-31.

The court's decision to allow the jury to draw twenty adverse inferences, 14-ER-3889-96, was contrary to this Court's precedent and is an erroneous outlier, as illustrated by analogous cases in which courts have *declined* to draw adverse inferences because information about the topic(s) at issue was available through other sources, *e.g.*, documents, prior statements of the witness, a 30(b)(6) deposition, testimony from other witnesses.[21]

### C. There was no "substantial need" for any of the inferences.

In light of the fundamental constitutional right at stake, there is no "substantial need" for an adverse inference concerning tangential matters that are not central issues in the case, or concerning matters for which other sources of information are available. *Nationwide Life*, 541 F.3d at 912-13; *Glanzer*, 232 F.3d at 1265. In *Nationwide Life*, this Court reiterated *Glanzer*'s holding that "'[b]ecause the privilege is constitutionally based,' . . . 'the detriment to the party asserting it should

---

[21] *See, e.g., Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 U.S. Dist. LEXIS 73843, at *19 (N.D. Cal. May 15, 2017); *United States v. Edlefsen*, No. 2:13-CV-00685-SU, 2014 U.S. Dist. LEXIS 133699, at *29-33 (D. Ore. July 23, 2014) (citing *Nationwide Life*); *Atencio v. Arpaio*, No. CIV. 12-2376-PHX-PGR, 2013 U.S. Dist. LEXIS 148918, at *5-6 (D. Ariz. Oct. 15, 2013) (citing *Glanzer* and *Nationwide Life*).

be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.'" 541 F.3d at 910 (quoting 232 F.3d at 1265). The Court stated that

> [t]he district court found explicitly that there was a substantial need for Angelina's testimony with respect to the deposition questions she refused to answer, because those questions *went to the central question in this case*. . . . Faced with an absence of any testimony from Angelina on *the central issue in the case*, the district court was entitled to draw the adverse inference.

*Id.* at 912-13 (emphasis added).

With respect to Newman, the central issue in the case is whether Newman *knew of, and approved of, the specific actions* of Daleiden and others that purportedly give rise to conspiracy liability. 16-ER-4319. By contrast, the first two adverse inferences have *no relationship whatsoever* to any "central issue" in this case:

> [Newman Inference #1:] Troy Newman co-authored the book Their Blood Cries Out, which reflects his beliefs that, quote: "The United States government has abrogated its responsibility to deal properly with the blood guilty." End quote. And that, quote: "This responsibility rightly involves executing convicted murderers, including abortionists, for their crimes, in order to expunge blood guilt from the land and people." End quote.
>
> [Newman Inference #2:] Troy Newman and his organization, Operation Rescue, operate the website abortiondocs.org which publicizes the names, photographs and business addresses of abortion providers, including Dr. Deborah Nucatola and Dr. Mary Gatter.

14-ER-3891. Similarly, Newman Inference #9 concerns vague statements from a book about *other* investigatory activities at abortion clinics that did not give rise to any cause of action in this case. 14-ER-3892-93; TRX 30.

27

Although the district court *excluded* the two-decade-old religious theological text referenced in Newman Inference #1 under FRE 403 (1-ER-113), the court *nevertheless* instructed the jury that they were permitted to draw these adverse inferences concerning irrelevant facts. 14-ER-3891-93 (Newman Inferences #1, 2, and 9). That was directly contrary to this Court's holding that "no negative inference can be drawn . . . *unless there is a substantial need* for the information." *Glanzer*, 232 F.3d at 1265 (emphasis added). The court's error was compounded by the fact that, even if the information was hypothetically tied to a central issue in the case, there were other means of presenting the information to the jury (as discussed previously).[22]

Moreover, although Plaintiffs have claimed that this is not a reputational harm or publication damages case, Newman Inference #15 *relates solely to publication*: "Troy Newman knew that CMP planned to create short videos to be posted online, containing portions of the footage that was recorded surreptitiously, and Newman previewed those videos before they were released." 14-ER-3894. This inference

---

[22] Furthermore, a suggestion in an email that Daleiden use an anonymous email address for purposes of the investigation—and there is no evidence that Daleiden ever did—should have been excluded. Dkt. #956 at 22. Nevertheless, the inference concerning the email (Newman Inference #6, 14-ER-3892) was unconstitutional because it did not relate to any *central* issue in the case, and there was no "need" for an inference that the email says what it says.

does not relate to any central issue in the case and is, therefore, unconstitutional. *Nationwide Life*, 541 F.3d at 912-13; *Glanzer*, 232 F.3d at 1265.

Finally, Plaintiffs had no substantial need for adverse inferences to prove what Newman's own subjective motivations or beliefs were, *e.g.*, that Newman subjectively wished that the investigation would result in government investigations, prosecutions, and convictions of those engaging in illegal fetal organ trafficking. Rather, as discussed previously, what Newman did (or did not) *know about, and approve of*, is what mattered, and there were numerous means of presenting evidence about that issue to the jury. Even if Newman's subjective intent had some minimal relevance, a person's intent, including an alleged fraudulent intent, "is usually proven by *circumstantial evidence* or by inferences drawn from the . . . [person's] *conduct*." *Retz v. Samson*, 606 F.3d 1189, 1198-99 (9th Cir. 2010) (emphasis added). Plaintiffs possessed voluminous evidence (*e.g.*, Newman's books, emails, public statements, and stipulations) in which Newman discussed his beliefs about abortion in general, Planned Parenthood in particular, and the undercover investigation. The lack of any "substantial need for the information," *Glanzer*, 232 F.3d at 1265, shows that the inferences were unconstitutional.

**D.    Some of the inferences are not supported by any evidence presented to the jury.**

An adverse inference "can only be drawn when independent evidence exists of the fact to which the party refuses to answer." *Glanzer*, 232 F.3d at 1264;

*Nationwide Life*, 541 F.3d at 912. The admissible evidence, if any, that corroborates the inference must be part of the record. *Baxter v. Palmigiano*, 425 U.S. 308, 317-18, 320 n.4 (1976) (corroborating evidence was part of the record that the decision-making body based its decision upon); *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) (under *Baxter*, "a defendant's silence . . . in conjunction with other evidence" that is "offered against" him "could support" an adverse inference); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995).

The Fifth Amendment does not permit the drawing of adverse inferences where counsel "employ[s] a shock-and-awe approach" by asking questions that are not grounded in evidence in the record.[23] Under a contrary view, a party could manufacture a purported "substantial need" for adverse inferences by simply declining to pursue other avenues of obtaining information, or by declining to offer admissible evidence into the record.

In this case, some of the inferences are unsupported by admissible evidence in the record. For instance, the district court properly excluded the only item of

---

[23] *Lawrence v. Madison Cnty.*, 176 F. Supp. 3d 650, 663 (E.D. Ky. 2016) (citing *Glanzer*); *id.* at 667 ("Lawrence's argument—which ultimately amounts to 'if she did one bad thing, she probably did another'—is not a reasonable inference drawn from evidence actually in the record."); *see also Farrah v. Chacon*, No. 18-cv-00895-NRN, 2018 U.S. Dist. LEXIS 223400, at *13 (D. Colo. Dec. 6, 2018) (citing *Glanzer*); *Gonzales v. City of San Jose*, No. 13-cv-00695-BLF, 2015 U.S. Dist. LEXIS 163955, at *18-20 (N.D. Cal. Dec. 4, 2015) (citing *Glanzer*).

evidence relating to Newman Inference #1: an old theological study about the immorality of abortion. 1-ER-113. Plaintiffs' purported "need" to prove that Newman opposes abortion was eliminated by Newman's stipulation that he opposes abortion on moral and religious grounds. 18-ER-5030. Incredibly, however, the court allowed an adverse inference that quoted the inadmissible religious text. 1-ER-112-13. As this Court held in *Glanzer*, where the evidence at issue is irrelevant and/or inadmissible under FRE 403, there is no "substantial need" for the information, and no adverse inference is permissible. 232 F.3d at 1266-67. Additionally, Newman Inference #16 (14-ER-3894) selectively quotes an email *that was never admitted at trial* (Exhibit 44).

Furthermore, no evidence in the record corroborates the assertions in Newman Inferences #10 and 11 about Newman's purported knowledge about BioMax:

> Troy Newman understood that BioMax was created as a front organization to provide a cover story to allow Daleiden, Merritt and Lopez to tape plaintiffs' doctors and staff. . . . Troy Newman understood that Daleiden, Merritt and Lopez lied about BioMax so they could tape plaintiffs' doctors and staff without rais[ing] suspicions.

14-ER-3893. Similarly, no evidence corroborates the claim in Newman Inference #12 that "Troy Newman knew that David Daleiden, Susan Merritt, Annamarie Bettisworth and Brianna Baxter were using false names in order to infiltrate conferences of abortion providers, because they would not get in using their real names." 14-ER-3893.

Where, as here, other means of obtaining information have yielded evidence that contradicts (or does not otherwise support) the requested inference, both law and logic indicate that an adverse inference is not warranted; the absence of any evidence to support a factual claim after a diligent search often means that *the claim is incorrect*. Here, the trial record does not support many of the inferences, making them unconstitutional. *See Nationwide Life*, 541 F.3d at 912; *Glanzer*, 232 F.3d at 1264-67 & n.2.[24]

### E. The district court erred by permitting inferences upon inferences that were not directly tied to questions for which a witness invoked the privilege.

Since "the assertion of the privilege necessarily attaches only to the question being asked and the information sought by that particular question," "the only possible negative inference that can be drawn from the unanswered question" relates directly to the specific subject matter of that question. *Glanzer*, 232 F.3d at 1265-66. For instance, to draw an inference that the witness fired a gun based on a refusal to answer the question "did you ever pick up the gun?" would be "constructing an inference on another inference." *Id.* at 1266, n.2.

The district court improperly "construct[ed] an inference on another inference," *Glanzer*, 232 F.3d at 1266, n.2, with Newman Inference #16:

---

[24] The inferences that are actually tied to evidence properly in the record are all invalid for other reasons discussed herein.

Troy Newman's motive and intent in participating in CMP and the Human Capital Project were to, quote, "Finish off Planned Parenthood and end abortion within a few years," end quote. And, quote, "Defund," end quote, Planned Parenthood, quote, "Take down their empire," end quote, and to, quote, "Destroy their death machine." End quote.

14-ER-3894. The deposition questions at issue related *solely* to authentication of documents and the meaning of the term "PP"; *none* of these questions asked Newman to explain what his subjective "motive and intent in participating in CMP and the Human Capital Project were."[25] Constructing inferences on inferences concerning these questions violated Newman's rights. *Glanzer*, 232 F.3d at 1265-66 & n.2.

The prejudice to Newman of Inference #16 was compounded by the fact that the inferences-on-inferences *do not accurately reflect the content of the documents*. The Facebook post made before Newman's deposition (TRX 47) is *forward-looking*, declaring that the burden of being a Defendant in lawsuits would not deter Newman from continuing his pro-life work. Similarly, the quoted portion of TRX 39 refers to Newman's *future* endeavors, discussing what Newman could do over the next few years with more funding. Additionally, the assertion that Newman hoped to "[d]efund" Plaintiffs, and "[t]ake down their empire," selectively quotes an email *that was never admitted at trial* (Exhibit 44), and misleadingly omits the email's

---

[25] 18-ER-5049-50 (citing Newman Depo. at 239:10-12, 242:18-243:2, 243:11-12, 256:8-11, 256:20-257:1, 272:6-8, 272:19-23).

statement that "putting them in jail," in light of the evidence of their illegal activities, was among the goals of the publication of the videos. As such, the documents themselves do not corroborate what the inferences-on-inferences claim.

**F.    Several of the inferences were barred by California Evidence Code § 913, FRE 501, and/or FRE 403.**

Federal Rule of Evidence 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Additionally, California Evidence Code § 913(a) (emphasis added) states:

> [If] a privilege is or was exercised not to testify with respect to any matter . . . neither the presiding officer nor counsel may comment thereon, *no presumption shall arise* because of the exercise of the privilege, and the trier of fact *may not draw any inference therefrom* as to the credibility of the witness or as to any matter at issue in the proceeding.

It is *undisputed* that, under these provisions, the jury was not permitted to "make an adverse inference as to claims in which California law provides the rule of decision." Dkt. #806 at 1-3. The district court's decision to permit the inferences, while instructing the jury that they may not consider the Fifth Amendment invocations with respect to California claims (14-ER-3889-90, 14-ER-3895) was contrary to FRE 501 and California Evidence Code § 913. Although giving a limiting instruction that jurors cannot draw an adverse inference as to California claims and defenses may make sense when the particular evidence or inference at issue is exclusively, or primarily, relevant to non-California claims, here, many of the deposition questions at issue, and Plaintiffs' proffered justifications for why an

inference is warranted, relate *primarily or exclusively to California claims*. This is unsurprising since most of the parties are California residents or California entities, and many of the events giving rise to this lawsuit occurred in California.

To illustrate, Plaintiffs repeatedly stated that the primary, if not exclusive, "need" for various adverse inferences was to (1) establish that Defendants' purpose was not to collect evidence of a violent felony against a person as required to establish a defense under California Penal Code § 633.5, and (2) demonstrate Defendants' fraudulent representations "as required under Cal. Bus. & Prof. Code § 17200."[26] Plaintiffs' extensive reliance upon their California § 17200 claim as a basis for needing the court to instruct the jury that they could draw numerous adverse inferences was particularly puzzling because *that claim was not presented to the jury* (it was decided by the court post-trial). Plaintiffs also heavily relied upon the adverse inferences when they requested an injunction under California § 17200.[27] As such, the inferences were prohibited by FRE 501 and Cal. Evidence Code § 913 (in addition to being unconstitutional).

Additionally, a potential adverse inference is subject to FRE 403: an inference is impermissible if its probative value is "substantially outweighed by the danger of

---

[26] 18-ER-5034-46 (which relate to Newman Inferences #1-3, 5, and #10-15 (14-ER-3891-94)).

[27] Dkt. #1048, ¶¶ 3, 12, 14, 18, 51-53 (citing Newman Inferences #1, 2, 3, 5, 7, 9, 10, and 16 (14-ER-3891-94)).

unfair prejudice that drawing the adverse inference on that question" presents to the opposing parties. *Glanzer*, 232 F.3d at 1266. As this Court has explained, "the *need* for the information contained in the question has to be *substantial*," *id.* at 1267 (emphasis added); if the information sought is insubstantial (*i.e.*, of little to no relevance to the case), or its probative value is outweighed by unfair prejudice, an adverse inference is improper. *Id.*

Here, Plaintiffs received a host of adverse inferences that they had no substantial need for, and that unfairly prejudiced Newman and the other Defendants. Whatever minimal probative value that invoking the privilege could hypothetically have was clearly outweighed by the danger that the jury would unfairly and improperly hold the invocation of the privilege against Newman, and against other Defendants by association, by mistakenly believing that invoking the privilege is an admission of guilt; *counsel for Plaintiffs made that very mistake* in this case. Dkt. #754 at 12 (citing Dkt. #662 at 10:19-21). Of note, the district court rejected Defendants' request to include within the court's adverse inference instructions the statement, drawn from Supreme Court jurisprudence, that "[t]he innocent and the guilty alike have a right to invoke the Fifth Amendment." Dkt. #966 at 1 (citing *Ullmann v. United States*, 350 U.S. 422, 427 n.2 (1956)); *cf.* 1-ER-111.

Further, the court improperly denied Newman's requests to exclude several items of evidence that were irrelevant and/or unfairly prejudicial under FRE 403: a

non-party's website, some of Newman's writings having nothing to do with this case, and an email suggesting that Daleiden use an anonymous email address for purposes of the investigation (which Daleiden never did). Dkt. #754 at 6; Dkt. #956 at 22-24. These errors were compounded when the court allowed several adverse inferences that were premised upon this improper evidence; without being anchored in properly admitted evidence in the record, the inferences are improper under *Glanzer*. 232 F.3d at 1266-67.

The most glaring example is the first inference (14-ER-3891), which was based solely upon an old theological study that the court properly excluded under FRE 403. 1-ER-113; Dkt. #956 at 24-27. As this Court noted in *Glanzer*, there cannot be a "substantial" need for an inference concerning a topic for which there is no admissible evidence. 232 F.3d at 1266-67. For all the same reasons that admitting the study itself would have been improper under FRE 403 (and FRE 610), the adverse inference concerning the study was inadmissible. Additionally, even if some of the items of evidence referenced above could (barely) pass the FRE 403 test, adverse inferences concerning a marginally relevant topic or item of evidence cannot possibly pass constitutional muster under the stringent standards discussed in *Glanzer*.

37

G.     **The district court erred by permitting adverse inferences based upon two non-parties' invocation of privilege.**

Whether, and when, adverse inferences may be drawn from a *non-party's* invocation of Fifth Amendment privilege is a matter of first impression in this Circuit. *Ayers v. Lee*, Case No. 14-cv-00542-BGS-NLS, 2020 U.S. Dist. LEXIS 218003, at *6 (S.D. Cal. Nov. 20, 2020) ("[T]he Ninth Circuit has not ruled on the admissibility of a non-party's invocation of his Fifth Amendment privilege. . . ."). Plaintiffs relied upon the Second Circuit case of *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997)—which this Court has never discussed or cited—in support of the claim that adverse inferences should be drawn from invocations of privilege by non-parties Baxter and Davin.

The district court ultimately concluded that "plaintiffs have made the required substantial need showing required under *Doe v. Glanzer* and other Ninth Circuit precedent to justify giving the jury a list of specific adverse inferences . . . with respect to . . . third-parties Baxter and Davin," 1-ER-112, even though *Glanzer* did not involve a non-party. The court instructed the jury that they could draw six adverse inferences from the non-party invocations of privilege, such as the following inferences:

> Brianna Baxter has been involved in pro-life activities since high school, including with Survivors of the Abortion Holocaust who describes itself as, quote, "Boots on the ground on the front lines of the battle to save pre-born babies of America." End quote. . . .

38

> Annamarie Bettisworth Davin has a long history of pro-life activism,
> including participation in Live Action and Survivors of the Abortion
> Holocaust, which believes that, quote, "Abortion in all of its forms is evil."
> End quote. . . .

14-ER-3895-96.

Even if one assumed that adverse inferences based upon non-party invocations of the privilege could be permissible in some cases, none of the inferences allowed by the district court here met the constitutional requirements outlined in *Glanzer*. There were less burdensome ways to obtain information about Baxter and Davin's activities as undercover investigators: Daleiden had personal knowledge of their activities and testified in detail about them, and there are also various emails in the record to or from these individuals. Whatever these non-parties' subjective motivations might have been is irrelevant, and certainly does not go to some central issue in the case.

Similarly, Plaintiffs had no pressing need to be able to prove to the jury that two non-parties believe that abortion is immoral and have been involved with various pro-life entities throughout their lives. In fact, *Plaintiffs themselves* told the jury that this case "is not about abortion. This is not about pro-life or pro-choice." 16-ER-4403. The non-party inferences were unconstitutional and unfairly prejudiced the Defendants.

### H.   Newman, and all other Defendants, were unfairly prejudiced by the district court's decision to permit numerous unconstitutional adverse inferences.

"[T]he danger of unfair prejudice is high when a jury is told that a witness declined to answer a question by invoking the Fifth Amendment; the implication is, at best, that the witness refused to answer because she had something to hide." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 171 (2d Cir. 2017) (admission of adverse inferences, which were coupled with an instruction to the jury and were repeatedly emphasized by opposing counsel during closing argument, was prejudicial error). Plaintiffs repeatedly relied upon and quoted the adverse inferences during their closing argument to support their claim that Newman conspired to commit various torts and illegal acts, 16-ER-4366-68, 16-ER-4427, and also heavily relied upon the adverse inferences in their post-judgment filings. 18-ER-4823, 18-ER-4871; Dkt. #1048 at ¶¶ 3, 12, 14, 18, 51-53.

Moreover, it is undisputed that none of the Defendants, including Newman, incited or encouraged others to commit acts of violence or other illegal acts against Planned Parenthood. 2-ER-159, 12-ER-3078. Nevertheless, despite the fact that the Court correctly held that Newman's decades-old theological study was inadmissible, 1-ER-113, Plaintiffs misrepresented that text (and the Court's inference concerning the text) to the jury, incorrectly claiming that Newman advocated for vigilante acts of violence against abortion providers "according to the adverse inference that you

40

are permitted to draw." 16-ER-4426-27.[28] As such, due to the improper adverse inferences, Plaintiffs were able to skirt the Court's admissibility ruling, and intentionally "impact" the jury with "the visceral words" of portions of an inadmissible theological text, 14-ER-3836, to the detriment of all Defendants.

Additionally, the sheer volume of unconstitutional inferences multiplied their prejudicial impact. As one decision that applied *Glanzer* explained, even when there is a constitutionally permissible basis for *some* inferences, allowing a long list of inferences can be unfairly prejudicial:

> [T]he permissibility of some adverse inferences . . . does not mean that Relators are entitled to adverse inferences from the dozens of questions asked. . . . In addition to being cumulative, *there is a danger that at some point the jury will become deaf to the substance of the questions asked and unanswered*, and as a result, the specific inferences that are appropriately drawn *will blur into a single inference that the defendants have committed all the acts alleged* by the Relators. To avoid this result, it is necessary to reduce the number of requested inferences *to those few* that relate to the heart of the alleged fraud, and which have the most reliable basis. . . .

*Custer Battles*, 415 F. Supp. 2d at 634-36 (emphasis added). By contrast, the district court here read the jury a litany of adverse inferences that had little, if anything, to do with "the heart of the alleged fraud," and that was unfairly prejudicial to all

---

[28] The unfair prejudice to Newman was compounded by the fact that, as discussed in Rhomberg's brief, the district court improperly allowed unfairly prejudicial testimony concerning historical acts of violence against abortion providers having no connection to the parties and issues in this case.

Defendants. *See id.*; *cf.* FRE 403 (prohibiting the admission of "needlessly . . . cumulative evidence").

Finally, counsel for all Defendants explained to the district court, in detail, how Plaintiffs' proposed adverse inferences would be unfairly prejudicial to all Defendants. 14-ER-3843-67. For instance, Defendants requested that the jury be instructed that they may not draw any adverse inference against any other Defendant based upon the invocation of privilege by Newman or by any witness, but this instruction was not given. 14-ER-3845-46. Defendants also objected to an inference that singled out two of CMP's purported goals, whereas the project proposal at issue listed *numerous* goals, 14-ER-3849, but the jury was instructed that they could infer that "Troy Newman understood that one of CMP's goals was to end abortion, and to defund and shut down Planned Parenthood." 14-ER-3891 (Newman Inference #3); *see also* 14-ER-3857-59, 14-ER-3896. Furthermore, the evidence showed that Merritt and Lopez did not know Newman during the course of the investigation, 4-ER-937, 5-ER-1075, but several of the inferences expressly linked Newman with Merritt and Lopez by name. 14-ER-3844, 14-ER-3893 (Newman Inferences #9-12).[29]

---

[29] *See also* 14-ER-3862-63 (reasserting an objection to the fact that Plaintiffs failed to introduce various documents into evidence through a witness, such as Daleiden); 14-ER-3844-45 ("[I]f the Court insists on some adverse inferences as to Newman we think the only way to avoid prejudice as to the other defendants would be to

In sum, the district court's erroneous rulings and instructions concerning the Fifth Amendment violated Newman's rights, unfairly prejudiced all Defendants, and deprived all Defendants of a fair trial. The judgment should be reversed in its entirety. In the alternative, the judgment should be reversed with respect to Newman.

## III. The jury verdict and judgment against Newman was not supported by substantial evidence, and should be reversed.

The district court's denial of Newman's motions for judgment as a matter of law are reviewed *de novo*. *Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013). A jury verdict must be supported by "substantial evidence." *Unicolors, Inc. v. Urban Outfitters, Inc*., 853 F.3d 980, 984 (9th Cir. 2017). If the record is "critically deficient of that minimum quantity of evidence" required to find a defendant liable under a claim, a verdict against that defendant on that claim cannot stand. *Venegas v. Wagner*, 831 F.2d 1514, 1517-18 (9th Cir. 1987).[30]

Here, the record lacks substantial evidence that Newman knew about, and agreed to be a part of, *unlawful* conduct. It is undisputed that (1) Newman did not attend any conference or meeting, sign any contract, procure or use any ID, record

---

bifurcate or sever those claims as to Newman and let the jury . . . decide those separately.").

[30] The issues discussed in this section were raised at Dkt. #595, 996, 999, 1056, 1080, and 1103, and ruled on at 2-ER-139, 1-ER-48, 1-ER-38, and 1-ER-2.

any individual, or communicate with any Plaintiff in connection with this case, and (2) Daleiden, *not Newman*, was "the ringleader of the defendants." 1-ER-619. As such, it is unsurprising that Plaintiffs *expressly excluded* Newman from twelve of the Complaint's fifteen claims. 24-ER-6667-90. The three claims pled "Against All Defendants" were RICO (Claim 1), Civil Conspiracy (Claim 3), and unfair competition (Claim 7). *Id.* Conversely, eleven claims were asserted "[a]gainst DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS," *id.*, and the fifteenth claim was asserted "[a]gainst BIOMAX, DALEIDEN, and MERRITT." *Id.* In other words, the Complaint asserted that Newman was liable via a conspiracy theory on the RICO and unfair competition claims.

*Nevertheless*, the jury found Newman liable as a co-conspirator for trespass, violation of RICO, fraudulent misrepresentation, false promise fraud, and violations of California, Florida, Maryland, and federal recording laws. 18-ER-4926-28, 18-ER-4935, 18-ER-4937, 18-ER-4939, 18-ER-4941, 18-ER-4945, 18-ER-4951, 18-ER-4955, 18-ER-4966. The jury also awarded $50,000 in punitive damages against Newman. 18-ER-4967. The district court entered judgment against Newman on these claims and the unfair competition claim. 1-ER-38, 1-ER-48.

44

**A.     Elements of conspiracy**

The district court held that "conspiracy 'is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.'" 2-ER-365 (citation omitted). Plaintiffs were required to prove, with respect to each cause of action asserted against Newman, that he "was aware that another Defendant or person planned to commit a wrongful act," "agreed with the other Defendant or person, and intended that the wrongful act be committed." 16-ER-4319. Plaintiffs failed to do so.[31]

The evidence showed that Daleiden intended to conduct a *lawful* investigation of ongoing illegal and unethical activities (4-ER-918-19, 5-ER-1240, 11-ER-2882, 11-ER-3009-11 12-ER-3091-92), and deliberately ran the investigation alone, keeping other people (including Newman) on a "need-to-know" basis. 12-ER-3082-83, 11-ER-2878. The minimal information that Daleiden provided to Newman about "concepts" for the investigation at the outset, and about the progress of the

---

[31] This Section assumes, for the sake of argument, that Plaintiffs established a claim against one or more other Defendants, and proceeds to explain why there was not substantial evidence that Newman knew about, intended, and agreed with the commission of those particular acts. To the extent this Court holds that any particular claim is unsupported by substantial evidence, or is otherwise not viable, the verdict and judgment holding Newman liable via conspiracy on that claim would necessarily fail as well.

investigation while it was ongoing, was insufficient to give Newman knowledge that any illegal or tortious acts were being committed, and similarly insufficient to show that Newman *agreed to* the commission of any wrongful acts.

Additionally, the California Supreme Court has stated that, "[t]o maintain a tort claim against a director [such as Newman] in his or her personal capacity, a plaintiff must . . . prove that an ordinarily prudent person, knowing what the director knew at that time, would not have acted similarly under the circumstances." *Frances T. v. Village Green Owners Ass'n*, 42 Cal. 3d 490, 508-09 (1986). The district court erred by holding that Plaintiffs were not required to satisfy this standard, 2-ER-247, which is particularly prejudicial in a case in which the undercover investigation at issue was based upon substantial information that numerous criminal and unethical actions were ongoing. 25-ER-6804-18.

## B. Summary of Newman's minimal knowledge and involvement

Voluminous evidence confirms that Newman had only cursory knowledge of the overall concepts of the investigation, but was not knowledgeable about, or involved with, the day-to-day details of how the investigation was being conducted. Back in 2010, Daleiden first began thinking about the need for an undercover investigation into illegal activities concerning fetal tissue procurement. 11-ER-2722, 11-ER-2785-86. From then on, Daleiden spent considerable time conducting research for the project. 25-ER-6804-18.

46

In 2012, Daleiden met with Newman to discuss concepts for his investigation. 9-ER-2469, 9-ER-2476. Newman was just "one of many different people" that Daleiden wanted to "bounce[] ideas off" and get "early informal brainstorming feedback from." 10-ER-2484-85. For instance, a January 2013 email (TRX 123) that Daleiden sent to Newman with "the bare bones of [Daleiden's] thoughts" about "initial concepts for an undercover investigation" that Daleiden "was brainstorming" did not provide much detail about specific investigatory methods. 9-ER-2469-72, 10-ER-2481-85. TRX 123's vague references to "gotcha tapings" and "park domain and temporary website for fake company" did not state that any illegal or tortious acts would be committed by investigators; rather, the fact that Daleiden's to-do list included reviewing "legal boundaries for moles" (TRX 123 at 1) indicated that Daleiden intended to use *legal* means for his project.[32]

After Newman received the "initial concepts" document, he encouraged Daleiden "to continue [his] work on this idea that [he was] constructing." 9-ER-2471-72, 9-ER-2478. The discussions that Daleiden and Newman had at that time were "more conceptual" than "goal-oriented," and Daleiden explained, "I don't

---

[32] Other evidence established that Daleiden intended to conduct the investigation in a legal and ethical manner. 11-ER-2881-82, 11-ER-3035-38, 11-ER-3064, 12-ER-3076-77, 12-ER-3091-92.

know . . . that those discussions really got very detailed into what's going to happen." 9-ER-2474-76.

Daleiden also drafted a project proposal for potential donors that summarized his research; Daleiden sent this document to Newman in March 2013 several weeks after he had sent it to others. 25-ER-6804-18, 11-ER-2811, 11-ER-2824-25, 12-ER-3132; *see also* 25-ER-6819. The proposal listed some of the many individuals, including Newman, that Daleiden had consulted concerning the concepts for his investigation. 25-ER-6816, 10-ER-2506, 11-ER-2840-41, 12-ER-3164.

Daleiden's proposal discussed how fetal organ traffickers were breaking the law and stated that the foundational goal of the investigation was to expose their crimes. 25-ER-6811, 11-ER-2826-28, 11-ER-2834-38, 11-ER-3063-64. Although the proposal stated that "[t]he proposed project will use a variety of innovative undercover techniques," 25-ER-6805, no details were given about how Daleiden intended to conduct the investigation besides the fact that there would be "undercover footage from real-life moles and orchestrated 'stings.'" 25-ER-6814, 25-ER-6810-11. This proposal *did not* outline a racketeering enterprise or criminal scheme; it merely outlined the kind of undercover journalism concerning important topics of public interest that has long held a venerable role within American society.

In light of the basic concepts for the investigation that had been shared with Newman, he agreed to be a member of CMP's board. 9-ER-2474. CMP "funded the

entire project and created the concept for it and was the owner of the intellectual property generated in it and is the entity that publicly released the project." 11-ER-2889. *CMP was not, however, involved with the day-to-day details of the investigation*; instead, the operation was conducted "under the auspices of BioMax," 12-ER-3076, which Daleiden alone organized "as a vehicle to use to do large parts of the undercover work." 11-ER-2886. The CMP board did not approve the creation of BioMax. 11-ER-2885.

It is undisputed that, throughout the entirety of the undercover investigation, *Daleiden, not Newman*, was "the ringleader of the defendants," 1-ER-619, and Daleiden personally conducted or directed all aspects of the investigation over the course of the next few years. A large volume of documentary and testimonial evidence proved that Newman was not knowledgeable about, or involved with, the details of how the investigation was carried out. For instance, it is undisputed that *Daleiden alone* did the following things:

- founded CMP and submitted CMP-related paperwork to government entities (9-ER-2449, 25-ER-6835; TRX 338);

- formed BioMax (without any board vote by CMP), and submitted BioMax-related paperwork to government entities (10-ER-2513, 11-ER-2885; TRX 364);

- modified or obtained a few driver's licenses that included fictional character names (see § I.A);

49

- hired the investigators, signed up and paid for conferences, and oversaw and/or created BioMax's website, brochures, and business cards (10-ER-2525, 10-ER-2531-34, 10-ER-2538-41, 12-ER-3076; TRX 31, 366, 684); and

- trained the investigators and sent them emails with information about their undercover characters and persons of interest at upcoming conferences or meetings (10-ER-2525, 10-ER-2582-84, 10-ER-2600-02; TRX 362, 363, 372, 426, 431).

Daleiden's unrebutted testimony confirmed that Newman did not direct, oversee, or control the day-to-day activities of Daleiden or any other individuals involved in the investigation. 12-ER-3073-75, 10-ER-2495 (Daleiden "was the sole manager over the entire project"), 10-ER-2586-87 (Daleiden was "the one who was leading the project"). Daleiden greatly limited the amount of information he shared with Newman, or anyone else, as a matter of operational security. 11-ER-2878-79. Several other witnesses confirmed Newman's lack of knowledge or involvement. 4-ER-937, 5-ER-1075, 5-ER-1124-29, 17-ER-4780-81.

In light of the overwhelming evidence that Newman did not conspire to commit any wrongful act, Plaintiffs' case against Newman rests upon the unconstitutional adverse inferences and several vague or general *post-investigation* statements:

- In July 2015, non-party Operation Rescue sent an email that identified Daleiden as the "Project leader" and "Project Manager" for the investigation, while listing Newman as President of Operation Rescue. TRX 28 at 3, 5. The email stated that "Newman serves on the Board of *Daleiden*'s Center for Medical Progress. During this investigation, Newman advised Daleiden, providing consultation services and material support." TRX 28 at 3 (emphasis added). This statement is consistent with the testimony establishing that,

although Daleiden *received* advice from many sources, he greatly limited the information that he *gave* to others about the details of the investigation. 10-ER-2484-85, 11-ER-2878-79.

- In July 2015, Newman sent emails objecting to the fact that "a lot of people" who had no connection to CMP or Daleiden were "participating in speaking on the subject" of CMP's videos. TRX 28 at 1. In this context, Newman said that "this originated from our office alone" and was an "undercover investigation by OR," referring to Newman's 2012 meeting with Daleiden at Operation Rescue's office. TRX 28 at 1; 9-ER-2469, 9-ER-2476.

- In July 2015, CMP's board declined an offer to buy the right to publish CMP's videos. 5-ER-1168-69; TRX 39. In response, Newman suggested that the individual could instead fund Newman's own future anti-abortion work: "I have been working to shut down abortion mills for years. This was only one of my plans. With the proper funding, we can finish off PP and end abortion within a few years. . . ." TRX 39 at 1.

- After the investigation was over and CMP had released its first video, Newman said "[t]his is about Planned Parenthood. Putting them in jail. Defunding them. Taking down their empire." TRX 106 at 1. Newman's expressed hope that the investigation would result in legislative and executive government action against those who committed crimes does not indicate that Newman had any knowledge of, or involvement in, the specific details of the investigation's daily activities *while it was ongoing*.[33]

None of these post-investigation statements provided a substantial evidentiary basis for the jury to conclude that Newman knew about, and conspired to engage in, any wrongful conduct before, or during, the course of the investigation. Moreover,

---

[33] Additionally, that Newman has often exercised his constitutional right to engage in *lawful* advocacy and activities to oppose abortion and Planned Parenthood—including lawful undercover investigations (TRX 30)—and has stated that he plans to continue to do so (TRX 47), is not evidence of an *unlawful* intent or conspiratorial agreement.

the unconstitutional and unfairly prejudicial adverse inferences based upon Newman's Fifth Amendment privilege (*see* § II) did not establish that Newman knew that others planned to commit *illegal or tortious* acts, and nevertheless agreed and intended that those acts be committed. The evidence (even if coupled with the inferences) simply established that Newman had some peripheral knowledge of an undercover investigation that was presented as, and was intended to be, a *lawful* investigation. Judgment should have been entered in Newman's favor on all counts.

### C.    RICO conspiracy

As discussed in Section I, no Defendant engaged in a pattern of RICO predicate acts. Moreover, Plaintiffs failed to prove that *Newman* knew that another person would commit multiple predicate offenses, and agreed and intended that those offenses be committed. 1-ER-102-05. As this Court has noted, "a defendant who did not agree to the commission of crimes constituting a pattern of racketeering activity is not in violation of section 1962(d), even though he is somehow affiliated with a RICO enterprise." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (citation omitted).

Plaintiffs failed to meet their burden to prove that Newman "knowingly agreed that [Daleiden] would conduct . . . the affairs of the enterprise through a pattern of racketeering activity," and "agreed to participate in the conspiracy with the knowledge and intent that at least one member of the racketeering conspiracy

would intentionally commit . . . two or more racketeering acts." 1-ER-105. To the contrary, the evidence conclusively established that *Newman had no knowledge of, or involvement in*, the production or transfer of any IDs.

Daleiden's initial "conceptual" document (TRX 123) given to Newman did not contain any information about the use of assumed names in general, or the procurement or transfer of identification documents in particular. 9-ER-2470-71. Prior to the release of the videos, Newman was never told that IDs were going to be used, the concept of using such IDs was never discussed with him, and Newman was never told that Daleiden had made or acquired IDs. 12-ER-3073-75. Similarly, the use or acquisition of IDs was never discussed during board meetings between Daleiden, Rhomberg, and Newman. 5-ER-1128-38, 5-ER-1241-42.

Further, it is telling that Plaintiffs withdrew their request for an adverse inference that "Troy Newman knew that David Daleiden and Susan Merritt obtained and used fake driver's licenses in the names of Robert Sarkis and Susan Tennenbaum. . . ." Dkt. #956-1 at 7. The district court gave no inferences concerning Newman's purported knowledge of IDs. 14-ER-3889-94. The verdict and judgment against Newman on the RICO conspiracy claim were premised upon unsupported speculation, and should be reversed.

**D.** **Conspiracy to commit fraudulent misrepresentation and false promise fraud.**

Plaintiffs failed to prove, through substantial evidence, that Newman conspired to commit fraud. There was no evidence that Newman (1) knew that any other Defendants would make false statements or promises to Plaintiffs in circumstances that would constitute a tort, (2) agreed with the commission of those torts, and (3) intended that they be committed. As discussed previously, the evidence demonstrates that Newman was not aware of the specific details of Daleiden's plan, as Newman was "basically in the background." 12-ER-3073-75. In sum, since there was not substantial evidence that Newman knew of, agreed with, and supported any Defendant's alleged plan to commit fraudulent misrepresentation or false promise fraud, the judgment should be reversed in this regard.[34]

Furthermore, Newman was not a party to any contract, was not included on any breach of contract claim in the Complaint, and was not held liable for breach of any contract. Newman should have been removed from the subparts of Plaintiffs' fraud claim that are based solely upon a contractual promise (18-ER-4937-40, 1-ER-111), as "a person who is not a party to a contract cannot be bootstrapped into a conspiracy tort" that arises from contractual promises or duties. *Singh v. U.S. Bank*,

---

[34] Additionally, although Newman was included on the fraudulent misrepresentation claim in the original complaint, 25-ER-6793, he was dropped from that claim in the amended complaint. 24-ER-6681.

Case: 20-16068, 02/26/2021, ID: 12018722, DktEntry: 29, Page 62 of 68

457 B.R. 790, 805 (E.D. Cal. 2011); *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 576 (1973) (non-parties to a contract may not be held liable on a conspiracy theory for alleged breach of contractual duties). As such, Newman is entitled to judgment concerning false promise fraud.

### E. Conspiracy to commit trespass and violate recording statutes.

It was fundamentally unfair, and contrary to the federal rules, to—at the eleventh hour—include Newman on claims, such as the trespass and recording claims, that Plaintiffs *expressly excluded* him from in their Complaint. FRCP 8(a) & (b)(1) (a complaint must provide a "short and plain statement" of each claim at issue, including who the claim is being "asserted against"); *Strong v. Wisconsin*, 544 F. Supp. 2d 748, 753, 768 (W.D. Wis. 2008) ("[B]y specifically identifying in his complaint some defendants on his failure to intervene claim and not others, plaintiff communicated to the defendants not included in the list that they were off the hook," so those defendants could not be held liable on that claim). The fact that the original complaint expressly *included* Newman on the federal recording claim, 25-ER-6786, but the amended complaint expressly *excluded* Newman from that claim, 24-ER-6673, is particularly telling. Although the district court correctly rejected Plaintiffs' belated attempt to include Newman on their contract claims (2-ER-179), the court erred by declining to do the same with respect to the trespass and recording claims. 1-ER-111.

Moreover, even if another Defendant committed trespass and/or violated recording laws, there is not substantial evidence that *Newman* knew that such tortious or unlawful actions were planned and agreed and intended that they should occur. Whether a particular act of recording, or entry into a conference or office, constitutes a violation of recording laws or a trespass is a fact-specific and jurisdiction-specific question. As discussed previously, however, Newman was not personally involved with any of these activities, nor did Daleiden provide him with specific details about what he was doing. There is simply no evidence to show, for example, that Newman knew that any undercover recordings would be made in two-party consent states in circumstances in which the other parties would have a reasonable expectation of privacy.

More generally, mere knowledge that, *at some point*, undercover investigators would likely record their conversations with individuals, and would likely accept invitations to meet inside offices and attend conferences, *does not* equate to knowledge that any laws would be broken or any torts would be committed. Many decisions have recognized that an agreement to have some affiliation with a journalistic venture *does not* give rise to conspiracy liability, even if a tort is committed during the course of the venture, absent proof that the individual defendant *had knowledge that tortious or illegal acts would be committed and*

56

*concurred in that improper conduct*.[35] Here, Plaintiffs failed to prove, through substantial evidence, that Newman had "actual knowledge that a tort [was] planned and concur[red] in the scheme with knowledge of its unlawful purpose. . . ." *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015) (emphasis added). The judgment should be reversed on the recording and trespass claims with respect to Newman.

### F.    Punitive damages and injunctive relief

For the same reasons that Newman is entitled to judgment on all claims asserted against him, the award of punitive damages against him (1-ER-46) should be vacated. There is no evidence that Newman had any unlawful intent; rather, he simply agreed to have peripheral involvement with a legal undercover investigation into criminal and unethical activities. A desire to see criminals brought to justice through proper legal channels (*e.g.*, government investigations and prosecutions) is not evidence of bad intent that should be punished through the imposition of punitive damages. Finally, the unconstitutional adverse inferences tainted the jury against Newman, and the punitive damages award should be vacated for that reason as well.

---

[35] *See, e.g., Downey v. Coalition Against Rape & Abuse, Inc.*, Civ. No. 99-3370 (JBS), 2005 U.S. Dist. LEXIS 7340, at *25-26 (D.N.J. 2005), *aff'd by* 2005 U.S. App. LEXIS 18866 (3d Cir. 2005); *Kisser v. Coalition for Religious Freedom*, No. 92 C 4508, 1997 U.S. Dist. LEXIS 1744, at *7-8 (N.D. Ill. Feb. 18, 1997); *Dowd v. Calabrese*, 589 F. Supp. 1206 (D.D.C. 1984).

Additionally, as explained in Rhomberg's brief, no Defendant violated California's unfair competition law, and as explained herein, Newman did not know about, authorize, or agree to any other Defendant's purportedly illegal activities. As such, the injunction that restricts Newman's ability to engage in future investigative activities (1-ER-46-47)—including a host of lawful, First Amendment-protected activities that are permissible in Newman's home state of Kansas, which is a one-party consent state, Kan. Stat. § 21-6101—should be vacated.

## Conclusion

All Defendants are entitled to judgment on the RICO claim. Additionally, the judgment, permanent injunction, and all imposed damages should be vacated with respect to Newman. Alternatively, if this Court determines that there are any claims for which Newman is not entitled to judgment as a matter of law, the judgment against him on those claims should be reversed, and the case remanded for further proceedings, due to the clear and prejudicial violation of Newman's constitutional rights with respect to the adverse inferences.

Respectfully submitted,

Dated: February 26, 2021

/s Edward L. White III
Edward L. White III
Erik M. Zimmerman
John A. Monaghan*
Christina A. Stierhoff
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105
Tel: (734) 680-8007; Fax: (734) 680-8006
ewhite@aclj.org

Vladimir F. Kozina
MAYALL HURLEY, P.C.
2453 Grand Canal Blvd.
Stockton, CA 95207
Tel: (209) 477-3833; Fax: (209) 473-4818
VKozina@mayallaw.com

* Not admitted to 9th Circuit bar

*Attorneys for Defendant Troy Newman*

59

## Statement of Related Cases

I am aware of the following related cases currently pending in this Court, which all arose from the same district court action that this case arose from:

The other Defendants-Appellants' principal appeals are: *Planned Parenthood Fed'n of Am., et al. v. Ctr. for Med. Progress, et al.,* Nos. 20-16070, 20-16773, and 20-16820.

Defendants-Appellants' joint appeal concerning the award of attorneys' fees and costs to Plaintiffs-Appellees is *Planned Parenthood Fed'n of Am., et al. v. Ctr. for Med. Progress, et al.*, No. 21-15124.

Dated February 26, 2021.

/s Edward L. White III
Edward L. White III
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105
Tel: (734) 680-8007; Fax: (734) 680-8006
ewhite@aclj.org

*Attorney for Defendant Troy Newman*

60

**Certificate of Compliance**

This brief contains 13,598 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated February 26, 2021.

/s Edward L. White III
Edward L. White III
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105
Tel: (734) 680-8007; Fax: (734) 680-8006
ewhite@aclj.org

*Attorney for Defendant Troy Newman*